UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GLENN SHERARD et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>SAFECO INSURANCE COMPANY OF AMERICA,<br><br>               Defendant. | CASE NO. C14-840 MJP<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT, MOTION FOR PARTIAL SUMMARY JUDGMENT |

THIS MATTER comes before the Court on Defendant Safeco Insurance Company of America's Motion for Summary Judgment (Dkt. No. 19) and Plaintiffs Erin Schlect, Fred Schlect, Carol Sherard, and Glenn Sherard's Motion for Partial Summary Judgment (Dkt. No. 28). Having reviewed the Motions, the Responses (Dkt. Nos. 21, 35), the Replies (Dkt. Nos. 27, 37), and all related papers, the Court hereby GRANTS Defendant's Motion in part and DENIES it in part and DENIES Plaintiffs' Motion.

**Background**

This case concerns a landlord insurance policy issued by Safeco Insurance Policy to Plaintiffs Carol Sherard and Glenn Sherard for a rental house in Monroe, Washington. Relevant provisions of the policy include the following "General Condition[ ]":

> 5. Loss Settlement. Covered property losses are settled as follows but not exceeding the applicable limit of liability stated in the Declarations:
>    a. the dwelling under **Coverage A — Dwelling:**
>       (1) We will pay the full cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:
>       (a) the limit of liability under this policy applying to the dwelling;
>       (b) the replacement cost of that part of the damaged dwelling for equivalent construction and use on the same premises as determined shortly following the loss; or
>       (c) the amount actually and necessarily incurred to repair or replace the damaged dwelling.
>       [ . . . .]
>       (4) When the cost to repair or replace the damage is more than $1,000, we will pay the difference between the *actual cash value* and replacement cost only after the damaged or destroyed property has actually been repaired or replaced.
>       (5) You may disregard the replacement cost loss settlement provisions under this policy for loss or damage on an *actual cash value* basis. You may still make claim for any additional liability according to the provisions of this Condition 5. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

(Dkt. No. 19, Smith Decl., Ex. 1 at 31–32.) Also relevant is the following "Definition[ ]":

> 2. *"Actual Cash Value"*
>    a. When damage to property is economically repairable, *actual cash value* shall mean the cost of materials and labor that would be necessary to repair the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.
>    b. When damage to property is not economically repairable or loss prevents repair *actual cash value* shall mean the market value of property in a used condition equal to that of the lost or damaged property, if reasonably available on the used market.
>    c. Otherwise, *actual cash value* shall mean the market value of new, identical or nearly identical property, less reasonable deduction for wear and tear, deterioration and obsolescence.
>    d. *Actual cash value* shall not include taxes or any expenses unless incurred following the loss.

(Id. at 35.) There is no definition given for "economically repairable."

A further policy "Declaration" reflects that the Sherards purchased "EXTENDED DWELLING COVERAGE—25% OF COV A LIMIT" for an $8 premium. (Id. at 13.) This "EXTENDED DWELLING COVERAGE" is described in an addendum:

> For an additional premium, the following is added to Loss Settlement, item 5.a. under General Conditions:
> (7) We will settle covered losses to the dwelling up to an additional 25% of the limit of liability shown in the Declarations for Coverage A provided you:
> (a) insure the dwelling to 100% of its replacement cost as agreed by us;
> (b) accept any yearly adjustments by us of Coverage A reflecting changes in the cost of construction for the area;
> (c) notify us of any addition or other remodeling which increases the replacement cost of the dwelling $5,000 or more:
>     i. within 90 days of the start of construction; or
>     ii. before the end of the policy period in which construction begins; and pay any resulting additional premium; and
> (d) repair or replace the damaged dwelling.
> If you fail to comply with any of the above provisions, the limit of liability shown in the Declarations for Coverage A shall apply.

(Id. at 41.) The Declaration also shows that the coverage "limit" on the dwelling was $116,100. (Id. at 14.)

The parties do not dispute that the insured property experienced a fire on or around July 10, 2013, during the policy term. (Dkt. No. 19 at 3; Dkt. No. 21 at 2.) There is also no dispute that fire is covered by the policy and that the Sherards timely notified Safeco of the loss. (Dkt. No. 21 at 3.) On July 11, Safeco's adjuster Kurt Abendschein sent a letter to the Sherards informing them that he was the "main contact" for their claim and also informing them that their policy limit for Coverage A: Dwelling was $116,100 with a deductible of $1,000. (Dkt. No. 29, Ex. B at 3.) No mention was made of the Sherards' extended dwelling coverage. On July 19, Safeco's adjuster Scott Ames estimated the "replacement cost value" of the house at $124,777.70. (See Dkt. No. 22, Ex. A at 19; Dkt. No. 35 at 2; Dkt. No. 21 at 3.) At some point

ORDER ON MOTION FOR SUMMARY
JUDGMENT, MOTION FOR PARTIAL
SUMMARY JUDGMENT- 3

after the fire but by approximately July 26, 2015, the Sherards retained Bud Dyer of Cascade Adjusters to assist them with their claim and Mr. Dyer notified Safeco of his representation. (See Dkt. No. 35 at 3; Smith Decl., Dkt. No. 36, Ex. 7 at 14.) On July 26, 2015, Mr. Abendschein sent Mr. Dyer a letter apparently enclosing the Ames estimate. (See Dkt. No. 36, Ex. 8 at 16–17; Dkt. No. 29, Ex. C.) Mr. Dyer responded on July 29, arguing that a market appraisal on which Safeco had proposed basing the actual cash value was unnecessary because a visual inspection of the property indicated it was "certainly repairable." (Dkt. No. 29, Ex. C. at SAFECO000160.) He further asserted that "Clearly Mr. Ames has determined that it is economically feasible to repair this home as his estimate to do so totals less than the extended dwelling limits afforded by the policy. This in itself would seem to nullify the need to fall back on a market appraisal in order to establish the actual cash value of this loss." (Id.) Mr. Abendschein responded on July 30, 2015, in a way that suggested that the determination that a structure is "economically repairable" is made by comparing the policy limits and the estimated replacement cost:

> Option A —Extended Dwelling Coverage requires that the dwelling is insured to l00%.of its replacement cost. The Coverage A — Dwelling limit is $116,100. The replacement cost estimate is $124,777.70 which means the structure is not economically repairable.

(Dkt. No. 22, Ex. 2 at 2.) However, Mr. Abendschein did not address Mr. Dyer's argument that the policy limits measurement should include the 25% greater policy limits provided by the extended dwelling coverage. Mr. Abendschein later stated in his deposition that coverage limits are not applicable to the economically repairable calculation: "We make the determination of economically feasible or economically repairable based on the item's value. You could have situations where the coverage for the dwelling is grossly under or grossly over the value of that dwelling structure. So the only fair way to do it is to do it by that dwelling's actual market value." (Dkt. No. 29, Ex. F. at 26:23–27:4.)

On August 7, Mr. Abendschein sent Mr. Dwyer a letter providing him the results of the market value appraisal and informing him a check was sent representing the "actual cash value" of the property as appraised. (Dkt. No. 36, Ex. 10 at 21.) Mr. Dwyer inquired whether the separate repair or replacement cost payment (known as the "depreciation holdback" or "replacement cost holdback") could be applied to improvements on the Sherards' residence rather than to this or another rental house; Safeco answered that it could not. (Dkt. No. 36, Ex. 12 at 28; id., Ex. 14 at 32–33.) Defendant claims Mr. Dwyer then informed Safeco that the Sherards did not intend to rebuild (Dkt. No. 36, Ex. 15 at 35), but the exhibit in question is more nuanced, complaining that Safeco had thus far failed to reimburse the Sherards for demolition and debris-removal costs that had already been incurred and explaining that "[T]he insured's have been forced to rely upon funds initially paid as the actual cash value of the loss in order to clear amounts owed by them for services provided. Based on limited funds available at this time, the insured's cannot proceed with the rebuilding process." (Id.)

Thereafter, the Sherards sought to assign the claim for the replacement payment to their adult daughter, Erin Schlect, who was then in the process of purchasing a new home with her husband. (Dkt. No. 36, Ex. 16.) After a number of communications and research into the question whether such a claim could be assigned, Safeco refused to accept the assignment on March 3, 2014. (Dkt. No. 36, Ex. 22 at 51.) At this time, the Safeco representative noted, "Our loss measurement to date includes an agreed cost of repair with Restoreco to repair the dwelling with like, kind and quality materials for $124,777.70, which included debris removal costs of $8,727.06. Since the insured incurred debris removal separately, the net amount applicable to reconstruction is $116,043.64. Mrs. Sherard's base limit for the dwelling is $116,100 and appears to be in line with its replacement cost. This triggers Extended Dwelling Coverage (EDC)

1   for an additional 25% of the policy limits available. With EDC, Mrs. Sherard's policy limit is

2   $145,125.00 if she incurs the replacement of the property [ . . . ] You have told me Mrs. Sherard

3   has been seeking alternative ways to make her Replacement Cost claim because she feels

4   financially prohibited from rebuilding. Based on the damage figures presented, this doesn't seem

5   to be the case. She appears to have limits sufficient to cover the costs." (Dkt. No. 36, Ex. 22 at

6   51.)

7         Plaintiffs differed from the interpretation of the policy to forbid such an assignment, and

8   this suit, alleging breach of contract by failing to properly investigate, adjust, and pay claims as

9   required by the policy, as well as for refusing to allow the assignment of the replacement cost

10  claim; violation of the Washington Consumer Protection Act by violating statutory law and the

11  Washington Administrative Code; bad faith; and violation of the Insurance Fair Conduct Act,

12  ensued.

13        Defendant Safeco now brings a motion for summary judgment, arguing the purported

14  assignment of the claim to Ms. Schlect was invalid, the contractual and extracontractual claims

15  by the Sherards must be dismissed because they disavow any rights under the purportedly

16  assigned policy, and the Shlects' contractual and extracontractual claims must be dismissed

17  because their primary residence does not qualify as a replacement under the policy and because

18  the purported assignment to them was ineffective. (Dkt. No. 19.)

19        Plaintiffs bring a cross-motion for partial summary judgment, arguing Safeco

20  misrepresented policy provisions as a matter of law by failing to disclose the extended dwelling

21  coverage when discussing available policy limits in violation of WAC 284-30-350 and WAC

22  284-30-330(1); that the term "economically repairable" in the calculation of actual cash value is

23  at minimum ambiguous and should be construed against Safeco to mean it costs less to repair a

24

ORDER ON MOTION FOR SUMMARY
JUDGMENT, MOTION FOR PARTIAL
SUMMARY JUDGMENT- 6

structure than is available under the policy limits; that Safeco failed to conduct a reasonable investigation in violation of WAC 284-30-340 by conducting faulty legal research into the post-loss assignment question; and that Safeco failed to adopt reasonable standards for the investigation of the claim in violation of WAC 284-30-330(3) by failing to document the rationale for refusing the assignment of the claim in the claim file or provide standards for evaluating such a request and by using a market appraisal for impermissible purposes.

## Discussion

### I. Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the movant meets this initial burden, then the burden shifts to the non-moving party to "designate specific facts" showing that there is a genuine issue of material fact for trial that precludes summary judgment. Celotex Corp., 477 U.S. at 324. An issue of fact is "genuine" if it can reasonably be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." Id.

Under Washington law, "[i]nsurance policies are to be construed as contracts, and interpretation is a matter of law." State Farm Gen. Ins. Co. v. Emerson, 102 Wn.2d 477, 480 (1984). "The entire contract must be construed together in order to give force and effect to each clause," and be enforced "as written if the language is clear and unambiguous." Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam Cnty., 112 Wn.2d 1, 10 (1989). If, on the other hand, "a policy provision on its face is fairly susceptible to two different but reasonable

interpretations, the policy is ambiguous and the court must attempt to discern and enforce the contract as the parties intended." Transcon. Ins. Co., 111 Wn.2d at 456–57.

An insurance contract "will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective." Wash. Pub., 112 Wn.2d at 11. Insurance contracts are interpreted "as an average insurance purchaser would understand them and give undefined terms in these contracts their 'plain, ordinary, and popular' meaning." Kish v. Ins. Co. of N. Am, 125 Wn.2d 164, 170 (1994) (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877). If, after attempting to discern the parties' intent, the insurance contract language remains ambiguous, "the court will apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning." Transcon. Ins. Co., 111 Wn.2d at 457.

II. Validity of Attempted Assignment of the Claim for Replacement Cost Holdback

Defendant and Plaintiffs both move for summary judgment on the issue whether the assignment of the replacement cost holdback was valid in this case. The Court holds in favor of Defendant's Motion. The answer to this question turns on law rather than disputed facts. Post-loss assignments are generally valid in Washington, despite language in the policy forbidding assignment without the insurer's permission. See PUD No. 1 v. Int'l Ins. Co., 124 Wn.2d 789, 800 (1994); Kiecker v. Pacific Indem. Co., 5 Wn. App. 871, 877 (1971). Washington thus follows the "rule that general stipulations in policies prohibiting assignments of the policy, except with the consent of the insurer, apply only to assignments before loss, and do not prevent an assignment after loss." 3 Couch on Ins. § 35:8. The rationale for this distinction is that "the purpose of a no assignment clause is to protect the insurer from increased liability, and after

events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity." Id.

An insurance policy which requires rebuilding or replacement of the property prior to a claim for the replacement cost payment is acceptable in Washington, and indeed, a policy with language similar to the Condition 5 (Loss Settlement) provision in the Sherards' policy was interpreted to forbid a claim for the replacement cost payment where the owners had not rebuilt or replaced the property and had no intention to do so. Hess v. N. Pacific Ins. Co., 122 Wn.2d 180, 186–87 (1993). The language ". . . we will pay the difference between the actual cash value and replacement cost only after the damaged or destroyed property has actually been repaired or replaced" thus means that no claim for the replacement cost has accrued until "actual repair[] or replace[ment]" has taken place. (See Dkt. No. 19, Smith Decl., Ex. 1 at 32.)

When these two strands of case law are read together, it is clear a claim for the replacement cost holdback cannot be assigned before "the events giving rise to the insurer's liability," including actual rebuilding or replacement, have occurred. See PUD No. 1, 124 Wn.2d. at 800 (1994) ("The plaintiffs argue, however, that even though a policy specifically prohibits assignments, an assignment of a claim, a cause of action, or proceeds may nonetheless be valid <u>if made after the events giving rise to liability have already occurred when the assignment is made</u>. We agree and affirm the trial court's summary judgment on the validity of the assignments. The purpose of a no assignment clause in an insurance contract is to protect the insurer from increased liability. <u>After the events giving rise to the insurer's liability have occurred</u>, the insurer's risk cannot be increased by a change in the insured's identity.") (emphases added); Kiecker, 5 Wn. App. at 877 ("After a loss has occurred <u>and rights under the policy have accrued</u>, an assignment may be made without the consent of the insurer, even though

1   the policy prohibits assignments.") (emphasis added). The requirement that an assignment must

2   be post-loss is necessary but not sufficient where there exists an additional prerequisite to

3   recovery. If the Court were to hold otherwise, the policy provision limiting the replacement cost

4   payment to no more than the amount "actually and necessarily incurred" in repair or replacement

5   would not function as a limit on recovery, as the parties intended. (Dkt. No. 19, Ex. 1 at 31.)

6   Rather, the insureds could transfer the claim for the entire replacement cost to any third party

7   interested in purchasing property, and the insurer's exposure would be certain and not

8   contingent.

9         Because the Court holds that no valid assignment took place, The Court need not address

10  Safeco's arguments regarding the validity of post-loss assignments absent a "financial interest"

11  by the assignee in the insured property or the validity of an oral assignment of the replacement

12  cost holdback under Washington law.

13        III.    Other Issues in Safeco's Motion

14        Safeco argues that contractual and extra-contractual claims by either the Sherards or the

15  Schlects must be dismissed because of the attempted assignment. Although Plaintiffs'

16  contractual and extra-contractual claims directly relating to the validity of the assignment are

17  moot in light of the Court's holding on the validity of the assignment, Plaintiffs still have several

18  other contractual and extra-contractual claims, including claims relating to Safeco's

19  representations as to the policy limit and extended dwelling coverage purchased by the Sherards.

20  The Sherards may have attempted to assign these claims to the Schlects as well, so the Court

21  must assess whether this aspect of the assignment was effective.

22        Safeco notes that generally speaking, an assignment must be in writing to be enforced.

23  See RCW 4.08.080. Oral assignments may nonetheless be recognized where the assignor

24

personally testifies to the assignment. MRC Receivables Corp. v. Zion, 152 Wn. App. 625, 631 (2009). Here, a declaration by one purported assignor, Mr. Sherard, indicates that the assignors intended to assign "replacement cost proceeds," not any other claims they may have had. (Sherard Decl., Dkt. No. 23 at 4–5.)

The Court concludes that either because the assignment was not writing or because the terms of the assignment included only replacement cost proceeds and not other contractual or extra-contractual claims, no assignment of contractual or extra-contractual claims took place, and any such claims remain with the Sherards. The Court does not agree with Safeco's unsupported position that simply because the Sherards incorrectly believe they had made a valid assignment, they waive their right to assert otherwise viable claims. (See Dkt. No. 19 at 20–21.) Argument in the alternative is acceptable.

Safeco further argues the Sherards cannot prove damages in any of their contractual or extracontractual claims, but the absence of damages for the assignment claim does not necessarily preclude damages for other claims such as the CPA claim regarding misrepresentation of applicable policy limits—claims Safeco does not address in its motion except to argue that they were waived because they did not appear as such in the Amended Complaint and the answer to a damages interrogatory. (Dkt. No. 27 at 6.) The Amended Complaint put Safeco on notice that Plaintiffs were claiming it paid a lower actual cash value payment based on an erroneous interpretation of the undefined phrase "economically repairable" and that Safeco misrepresented the policy limits available pursuant to the purchase of extended dwelling coverage. (See Am. Compl., Dkt. No. 18 at 2.) An imprecise interrogatory response alone does not constitute waiver under these circumstances.

The Court therefore grants Safeco's motion for summary judgment on Plaintiffs' contractual and extracontractual claims with respect to the Schlects only.

IV. Plaintiffs' Motion for Partial Summary Judgment

Because the Court finds that no assignment occurred as a matter of law and that Safeco was within its rights to deny the request for the assignment of a claim that had not accrued, the Court denies Plaintiffs' Motion with respect to claims related to Safeco's handling of the assignment request. Plaintiffs also ask the Court to grant summary judgment in favor of Plaintiffs on their claim that Safeco failed to adopt and implement reasonable standards for the investigation of an insurance claim by failing to adopt any policy, procedures, or training related to adjustment of their claim as it relates to the interpretation of the phrase "economically repairable," and to grant summary judgment in favor of Plantiffs on their claim that Safeco misrepresented policy limits and concealed pertinent policy benefits or coverages in violation of WAC 284-30-350 and engaged in unfair settlement practices by misrepresenting policy limits in violation of WAC 284-30-330(1). (Dkt. No. 28 at 1–2; 12–13.)

Plaintiffs first claim they are entitled to an actual cash value payment based on the policy's definition for "economically repairable" property because their replacement cost limits (with the extended dwelling coverage) exceed Safeco's estimated cost of repair or replacement. (Dkt. No. 28 at 13–15.) Safeco counters that the phrase "economically repairable" is understood by the industry, its adjusters, and courts in various jurisdictions outside Washington, solely with reference to the market value of the depreciated property prior to the loss. (Dkt. No. 35 at 17–21.) Plaintiffs' only evidence to counter this argument is that Safeco's own adjuster appeared to adopt the Sherards' proposed interpretation of "economically repairable" in explaining to the

Sherards why the non-economically repairable calculation would be used to calculate their actual cash value payment prior to the appraisal:

> Option A —Extended Dwelling Coverage requires that the dwelling is insured to l00%.of its replacement cost. The Coverage A — Dwelling limit is $116,100. The replacement cost estimate is $124,777.70 which means the structure is not economically repairable.

(Abendschein Letter, Dkt. No. 22, Ex. 2 at 2.) While this paragraph is not a model of clarity, it does not amount to a representation by Safeco that contradicts the generally accepted definition of "economically repairable," but rather a clumsy attempt to respond in the alternative to the argument promoted by Mr. Dwyer in a previous letter. (See Dkt. No. 35 at 6 (citing Abendschein Dep., Dkt. No. 36-1, Ex. 23 at 32:9–33:3).) Because Safeco's interpretation of the phrase also accords with common sense, the Court denies summary judgment as to any contractual or extracontractual claims based on the meaning of "economically repairable" in the calculation of actual cash value payments under the policy.

Plaintiffs next argue Safeco failed to adopt reasonable standards for the investigation of their claim by using an appraisal report in a manner other than to secure financing for the property. (Dkt. No. 28 at 20; 37 at 3–4.) Because Plaintiff has not cited any authority supporting its novel theory that the use of an appraisal report designed for mortgage finance transactions is per se unreasonable when used in the insurance context, the Court denies summary judgment on this WAC-based CPA claim.

Finally, Plaintiffs argue the Court should find WAC violations based on misrepresentation of the policy limits as a matter of law. Safeco argues the extended dwelling coverage provision applied only in the event of repair or replacement, the building was not repaired or replaced at the time of the communications about the applicable coverage limits, and Mr. Abendschein accurately stated the base "Coverage A limits" in the absence of repair or

ORDER ON MOTION FOR SUMMARY
JUDGMENT, MOTION FOR PARTIAL
SUMMARY JUDGMENT- 13

1  replacement. (Dkt. No. 35 at 16.) This argument regarding affirmative misrepresentations does

2  not assist Safeco with respect to WAC 284-30-350, which provides, "No insurer shall fail to

3  fully disclose to first party claimants all pertinent benefits, coverages or other provisions of an

4  insurance policy or insurance contract under which a claim is presented." (See Dkt. No 29, Ex. B

5  (July 11, 2013 Abendschein Letter); Ex. D, July 31, 2013 Abendschein Letter).) Plaintiffs may

6  argue to a jury that Mr. Abendschein "[m]isrepresented pertinent facts or insurance policy

7  provisions" in violation of WAC 284-30-330(1) by omitting information about the extended

8  dwelling coverage in the absence of repair or replacement even as the insureds were actively

9  considering whether to repair or replace their property. However, a WAC violation does not give

10 rise to liability in the absence of damages and on this record Plaintiffs have not put forth

11 evidence of damage sufficient for the Court to grant summary judgment in their favor. ( In

12 addition, the second violation Plaintiffs allege, a WAC applicable to "insurance producer[s] or

13 title insurance agents," does not appear to apply because State Farm's adjuster was not an

14 insurance producer under Washington insurance law. See RCW 48.17.010 ("'Insurance

15 producer' means a person required to be licensed under the laws of this state to sell, solicit, or

16 negotiate insurance.").) The Court therefore denies summary judgment on Plaintiffs' CPA claim

17 based on WAC violations.

**Conclusion**

19  The Court GRANTS Safeco's Motion on claims relating to the purported assignment

20 from the Sherards to the Schlects, GRANTS Safeco's Motion as to claims brought by the

21 Schlects, DENIES Safeco's Motion as to contractual and noncontractual claims brought by the

22 Sherards, and DENIES Plaintiffs' Motion in full.

1   The clerk is ordered to provide copies of this order to all counsel.

2   Dated this 9th day of October, 2015.

Marsha J. Pechman
Chief United States District Judge

ORDER ON MOTION FOR SUMMARY
JUDGMENT, MOTION FOR PARTIAL
SUMMARY JUDGMENT- 15